Marie HORNICK

v.

**BOROUGH OF DURYEA, Borough of Duryea Police Department et al.**

Civ. No. 78–24.

United States District Court, M. D. Pennsylvania.

Nov. 6, 1980.

David I. Fallk, Scranton, Pa., for plaintiff.

Jos. J. Musto, Wilkes Barre, Pa., Anthony J. Miernicki, Shenandoah, Pa., for defendants.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

This action, brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* seeks redress for alleged sex discrimination in employment practices. Plaintiff, Marie Hornick, contends that she was the victim of discriminatory treatment during her tenure as a temporary member of the Duryea police force from October 1972 to January 1, 1974. She also alleges that she was denied employment as a Duryea police officer subsequent to January 1, 1974 solely because of her sex. Plaintiff requests appointment to the police force, back pay and reasonable attorney's fees.

Defendants, the Borough of Duryea, the Borough's Police Department, Police Chief, Mayor, Civil Service Board,[1] and members of the Borough's Council and Civil Service Board, contend that this court lacks jurisdiction under Title VII because the Borough did not employ the requisite number of employees to constitute an "employer" within the ambit of the Act.[2] With respect to the merits of her complaint, defendants assert that plaintiff failed to establish a *prima facie* case of sex discrimination. Alternatively, defendants contend that plaintiff's *prima facie* case was rebutted by evidence that purported to demonstrate that she was unqualified to serve as a police officer.

This matter was tried before the court without a jury on March 17, 18 and 19, 1980. The parties have submitted proposed findings of fact, conclusions of law, and legal memoranda, and the case is now ripe for disposition.

For analytical purposes, plaintiff's grievances have been grouped chronologically into three phases. Phase I covers plaintiff's employment as a police officer from October 1972 to January 1, 1974, and the subsequent refusal to hire her as a special police officer shortly after the January 1, 1974, discharge. These matters were the subject of a discrimination charge filed with the Equal Employment Opportunity Commission (EEOC) on or about February 26, 1974. The EEOC, on April 9, 1976, issued a Notice of Right to Sue and also determined that there was no reasonable cause to credit plaintiff's allegation that she was denied a position as a police officer because of her sex. Plaintiff did not file an action within ninety days from receipt of the Right to Sue Notice and, accordingly, this court lacks jurisdiction to afford relief with respect to Phase I of the charges of disparate treatment.

Phase II concerns the period from August, 1975, when plaintiff was appointed a special police officer in the Borough, to June, 1977, when the Borough's Civil Service Board administered an examination for the purpose of hiring two full-time police

---

1. The parties have referred occasionally to the Borough's Civil Service Board as the Civil Service Commission.

2. Throughout this opinion the Borough and defendants are used interchangeably, unless otherwise specifically noted.

officers. Plaintiff's treatment at the hands of the Borough during this period is covered by a second charge filed before the EEOC in November of 1976. I find with respect to this aspect of the case (1) that during the relevant years the Borough was an "employer" within the purview of Title VII; (2) that plaintiff has failed to prove that she was denied assignments as a special police officer because of her sex; (3) that the height and weight requirements promulgated by the Civil Service Board had a substantial adverse impact on females; (4) that plaintiff would have applied to take the civil service exam but for the height and weight requirements; and (5) that defendants have failed to rebut plaintiff's *prima facie* case of sex discrimination.

Phase III of this case concerns the Civil Service test which plaintiff took and failed in November, 1979. I find that plaintiff has failed to demonstrate that this examination had a substantial adverse impact on females and, therefore, that plaintiff has not established that the defendants are presently denying her a position on the police force solely because of her sex.

Accordingly, plaintiff will be granted back pay minus monies earned in other employment from June 30, 1977 until December 1, 1979, the period during which I believe plaintiff was denied a position on the police force solely because of her sex. The following constitute the requisite findings of fact and conclusions of law. *See* Fed.R.Civ.P. 52(a).

### FINDINGS OF FACT

A. *Jurisdictional Facts*

1. Plaintiff is a white female residing in the Borough of Duryea.

2. Defendant Borough of Duryea is a municipal corporation with a population of approximately 5,100 persons.

3. During the year 1977, the Borough employed 14 full-time workers, two part-time workers, and ten workers employed under the Comprehensive Employment and Training Act (CETA). During the year 1978, the Borough employed 13 full-time workers, four part-time workers, and seven CETA workers. (N.T. 229–231)

B. *Phase I Findings*

4. Defendant Duryea Police Department consists of five full-time permanent police officers and a variable number of special police officers, who work part-time. (N.T. 22; Deposition of Peter Olszewski, N.T. 16)

5. Defendant Duryea Civil Service Board is a three-man commission organized, *inter alia*, to administer an examination for the purpose of recommending appointment of civil service status police officers to the Duryea Police Department. (N.T. 143)

6. The Duryea Borough Council has the authority to appoint full-time civil service members to the Duryea Police Department and to appoint special police officers. (N.T. 158)

7. The Borough's Police Chief has no formal input into the hiring process for Duryea police officers. (N.T. 69–70)

8. In September, 1972, plaintiff was hired as a school crossing guard by the Borough. (N.T. 3)

9. On October 14, 1972, plaintiff was hired as a temporary police officer by the Borough pursuant to a special monetary grant given to the Borough following the Hurricane Agnes disaster. This grant is referred to as the Barnum Flood grant, and persons hired as police officers pursuant to the grant were sometimes referred to as "flood police."[3] (N.T. 3)

10. At the time plaintiff was hired under the Barnum flood grant, Gary Sworen was working as a police dispatcher, (N.T. 38–39) and Leonard Ash was a member of the police department and paid from flood grant funds. (N.T. 4)

---

**3.** In the aftermath of the Hurricane Agnes disaster a trailer park was set up within the limits of the Borough of Duryea to house flood-relief workers. Because of the substantial influx of people in the Borough of Duryea additional law enforcement help was needed. The name of the trailer park was the Barnum Trailer Park, and the funds provided to pay for additional law enforcement assistance were referred to as the Barnum Flood Grant.

11. Plaintiff worked as a police officer in Duryea until January 1, 1974, when the Barnum grant money ran out. (N.T. 4)

12. Prior to her discharge plaintiff inquired as to the possibility of being retained once Barnum funds had been exhausted, and was told that there were no available openings. (N.T. 282)

13. Shortly after January 1, 1974, Gary Sworen and Leonard Ash were retained as special police officers. (N.T. 311–314)

14. On February 26, 1974, plaintiff made her first charge to the EEOC, complaining of disparate treatment while she was on the force, and also that the retention of Gary Sworen after Barnum funds had been spent constituted sex discrimination. (N.T. 4–5)

15. On April 9, 1976, the EEOC issued a Notice of Right to Sue and a determination of no reasonable cause to credit plaintiff's charge. (Plaintiff's Ex. No. 7)

16. Plaintiff did not institute legal action within ninety days after receipt of the Right to Sue letter.

C. *Phase II Findings*

17. On August 5, 1975, plaintiff was designated a special police officer in the Borough of Duryea. (N.T. 5)

18. Special police officers work for the Borough at the direction of the Chief of Police; special police officers work for private organizations at church festivals, fireman picnics, etc., at the request of the individual organizations. (N.T. 46–47) The Chief of Police had no input in deciding who would work for private organizations. (N.T. 47)

19. On February 15, 1976, George Selden, whose service on the Duryea police force pre-dated plaintiff's, was rehired as a special police officer and received work assignments. (N.T. 4–5)

20. Between August, 1975 and September, 1976, plaintiff was not given any work by the Borough Police Department, although listed as a special police officer. Between August, 1975 and September, 1976, plaintiff was not requested by any private organizations to work at a private affair. (N.T. 289, 425)

21. In September 1976, plaintiff agreed to work as a school crossing guard with the understanding that along with school crossing responsibilities she would work part-time as a police officer. (N.T. 289–290)

22. After working two or three days as a school crossing guard plaintiff quit. She had not received any police assignments during that two to three day period. (N.T. 289–90)

23. On November 18, 1976, plaintiff filed a second charge with the EEOC complaining of the failure to assign her police duties. On February 18, 1977, plaintiff amended her charge to include the claim that reappointment of Selden without assigning police work to her constituted sex discrimination. (N.T. 6–7)

24. In June, 1977 Joseph Haduck was hired by the Borough Council as a special police officer. (N.T. 7)

25. Also in June 1977, there were openings for two full-time civil service police officers in Duryea, and the Duryea Borough Council formed a Civil Service Board for the purposes of promulgating job requirements and composing and administering an examination. (N.T. 8, 143)

26. Members of the Civil Service Board were William Domzalski and Frank Haduck, councilmen, and Donald Major, Borough secretary. Shortly after the formation of the Board Frank Haduck resigned. (N.T. 143)

27. The Civil Service regulations adopted by the Board were a composite of regulations used by the towns of Avoca and West Pittston, and the Pennsylvania State Police. (N.T. 145)

28. The Civil Service regulations provided in pertinent part:

Every applicant for the position of Patrolman shall demonstrate his ability to pass the following physical requirements:

. . . . .

(c) His height, weight, blood pressure, and chest expansion shall fall within the following limits:

\* \* \* \* \* \*

Weight must be in proportion to height

\* \* \* \* \* \*

in accordance with Schedule S(A)

Schedule S(A) consisted in part of the following height-weight table:

| HEIGHT | MINIMUM WEIGHT | MAXIMUM WEIGHT |
|--------|----------------|----------------|
| 5'8" | 140 lbs. | 180 lbs. |
| 5'9" | 145 lbs. | 185 lbs. |
| 5'10" | 150 lbs. | 190 lbs. |
| 5'11" | 155 lbs. | 195 lbs. |
| 6' | 160 lbs. | 205 lbs. |
| 6'1" | 165 lbs. | 210 lbs. |
| 6'2" | 170 lbs. | 220 lbs. |
| 6'3" | 175 lbs. | 225 lbs. |
| 6'4" | 180 lbs. | 230 lbs. |
| 6'5" | 185 lbs. | 235 lbs. |

29. The height and weight requirements were not mentioned in the public notices of the civil service examination published in local newspapers. (N.T. 200)

30. Upon seeing the advertisement concerning the civil service test plaintiff approached her neighbor, J. William Domzalski, Chairman of the Civil Service Commission and a Borough councilman, who advised plaintiff that she did not meet the Borough's height and weight standards, and that she was probably too old to apply for the position. (N.T. 430)

31. The following day, June 13, 1977, plaintiff telephoned the EEOC investigator assigned to her case, Mr. Robert Dingle, and discussed the age, weight, and height requirements. (N.T. 432)

32. Several days later plaintiff went to the Borough Building to obtain an application for the Civil Service exam. The police dispatcher on duty did not have any application forms, and advised plaintiff that she could secure one from a member of the Civil Service Commission. (N.T. 433–35)

33. Plaintiff did not thereafter obtain an application and never applied to take the June 1977 Civil Service test. (N.T. 430–37)

34. As a result of the June 1977 test two men, Leonard Ash and Joseph Haduck were hired as civil service police officers by the Borough of Duryea. (N.T. 8)

35. In December 1977, another man, Gary Sworen, was hired as a civil service police officer by the Borough of Duryea without a new test being given. (N.T. 8) Sworen had received the third highest score on the June examination. (N.T. 320)

36. On July 29, 1977, the EEOC issued its determination on plaintiff's second charge, finding in pertinent part:

[T]he [Borough's] height requirement clearly had a disparate effect on females. [The Borough] has made no showing that this criterion is validly related to successful performance of the jobs concerned; it is clear that the criterion is illegal under Title VII as amended. Accordingly, there is reasonable cause to believe Charging Party has not been hired by [the Borough] because of her sex. (Plaintiff's Ex. No. 8).

37. Efforts to amicably resolve the matter were unsuccessful, and on November 28, 1977, the EEOC issued plaintiff a Right to Sue letter. This action was instituted on January 10, 1978.

### D. *Phase III Findings*

38. In November 1979 a standardized civil service examination compiled by the International Personnel Management Association was administered for the Borough of Duryea by Mr. Phillip R. Tuhy, an assistant professor in the Political Science Department at Wilkes College. (N.T. 350–56)

39. The written component of the examination consisted of three separate multiple choice tests, the California Test of Mental Maturity, the California Test of Personality, and the Policeman's Test prepared by the International Personnel Management Association. (N.T. 356)

40. The California Test of Mental Maturity is an IQ test and, in the weighting of the overall examination, is valued at 10 per cent. The California Test of Personality purported to measure social adjustment and also comprised 10 per cent of the exam. The Policeman's Test sought to focus on those areas or abilities that would be predictive of performance as a police officer. It consisted of twenty photographic identification questions, twenty-five reading comprehension questions, thirty vocabulary questions, twenty quantitative math questions; and twenty-five logical reasoning questions. The Policeman's Test was

weighted at 50 per cent of the entire examination. (N.T. 357–377)

41. The oral section of the Civil Service exam comprised 30 per cent of the overall test. (N.T. 362)

42. Rules adopted by the Duryea Civil Service Commission established a composite passing grade of 70, but also provided that a candidate must pass each portion of the examination. Thus, to be successful a candidate had to pass each segment to the test and achieve an overall score of at least 70. (N.T. 365)

43. The passing grade for the segment of the test referred to as the Policeman's Test was 70 correct out of 120 questions. (N.T. 367)

44. Regulations adopted by the Duryea Civil Service Commission for the November 1979 test did not prescribe height and weight minima, and plaintiff was eligible to compete for a position on the police force. (N.T. 12)

45. Including plaintiff, three men and two women sat for the November 19, 1979 exam. (N.T. 355)

46. Plaintiff's composite score was 70.2, but she had flunked the Policeman's Test with a raw score of 59 correct answers out of 120 questions asked. Therefore, she failed the Civil Service exam. (N.T. 366–67)

47. Of the remaining persons who sat for the November 1979 Civil Service test the three males received passing scores, and the other female failed. (N.T. 365–66)

48. From November 1972 to November 1979 Professor Tuhy had administered the Policeman's exam ten separate times in various municipalities to 77 candidates, of whom 74 were men and 3 were women. Forty-four males or 59.5 per cent of all male candidates passed the exam; all three women had failed. (N.T. 401–03)

## DISCUSSION

### A. *Jurisdiction*

Title VII contains a number of strictures, both procedural and substantive, which although not necessarily "jurisdictional" in the strict sense of the term, nonetheless constitute formidable barriers to the prosecution of an employment discrimination suit. Two are applicable here: (1) the requirement that court action be initiated within ninety days of receipt of an EEOC "Right to Sue letter", and (2) the provision that limits the reach of Title VII to those persons[4] who employ at least 15 employees for each working day in at least 20 weeks for the years in which the alleged discriminatory practices occurred. 42 U.S.C. § 2000e(b).

### 1. *The Ninety Day Limitations Period*

The EEOC, on April 9, 1976, sent plaintiff a Right to Sue letter concerning her charges of disparate treatment from October 1972 to February 1974. Plaintiff did not institute suit within ninety days of receiving this letter, and has not offered any reason why she failed to do so. Accordingly, this court is without power to grant relief with respect to any matters covered by the first EEOC charge, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798, 93 S.Ct. 1817, 1822, 36 L.Ed.2d 668 (1973), and instances of alleged discrimination included in the first charge will be considered only insofar as they bear on later acts of alleged discrimination.

### 2. *An "Employer" within the Purview of Title VII*

The dispositive jurisdictional issue with respect to the second EEOC charge is whether the Borough of Duryea was an "employer" under Title VII during the relevant time period.[5] The parties are in

---

**4.** "Person" is defined to include "one or more individuals, governments, governmental agencies, political subdivisions, labor unions, partnerships, associations, corporations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organiza-

tions, trustees, trustees in bankruptcy, or receivers." 42 U.S.C. § 2000e(a).

**5.** For purposes of Title VII an "employer" is defined as "a person engaged in an industry affecting commerce who has 15 or more em-

agreement that during 1977 the Borough employed 14 full-time workers, two part-time workers, and 10 CETA workers; during 1978 the corresponding figures are 13 full-time workers, four part-time workers, and seven CETA workers. Defendants contend that part-time help and CETA workers are not "employees" as that term is used in Title VII, and, therefore, the Borough did not employ enough people to come within the ambit of Title VII.

 Much of defendants' argument has focused on the status of the CETA workers.[6] I find it unnecessary, however, to determine whether CETA workers are also municipal employees under Title VII. Total non-CETA full- and part-time workers exceed the jurisdictional threshold, and I am in accord with those courts which have held that part-time workers are to be counted in ascertaining whether a "person" is an "employer" and therefore subject to the remedial provisions of Title VII. *See Dumas v. Town of Mount Vernon*, 612 F.2d at 979 n.7; *Pedreya v. Cornell Prescription Pharmacy*, 465 F.Supp. 936, 941 (D.Colo. 1979); *Pascutoi v. Washburn-McReavy Mortuary*, 11 F.E.P. 1325, 1327 (D.Minn. 1975). *See generally* Shlei and Grossman, *Employment Discrimination Law* 837–38 (1976) (hereinafter referred to as *Shlei and Grossman*).

 The fact that the two part-time employees in 1977 and two of the part-time employees in 1978 were school-crossing guards who worked only a couple of hours a day and were paid only $40.00 per month is not significant.

It has been consistently held that Title VII is remedial in nature and should be given the broadest interpretation consistent with its purpose. In addition, it has been held that liberal construction should also be given to the definition of 'employer' so as to carry out the Congressional purpose of eliminating inconvenience, unfairness and humiliation of discrimination.

In the debates which preceded the passage of Title VII it was made clear that 'the term "employer" is intended to have its common dictionary meaning' and that employers with part-time or seasonal staffs were intended to be covered by the Act 'when the number of employees exceeds the minimum figure.'

*Pedreya v. Cornell Prescription Pharmacy*, 465 F.Supp. at 941. The school-crossing guards were hired, controlled, and paid by the Borough. Accordingly, they constitute "employees" and the Borough was an "employer" subject to the anti-discrimination provisions of Title VII.[7]

### B. The Merits

Plaintiff seeks relief under two of the four generally recognized employment discrimination theories: "disparate treatment" and "disparate impact."[8] *See generally*

---

ployees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such a person...." 42 U.S.C. § 2000e(b). The "current" year referred to in the statute is the year in which the alleged discrimination occurred. *See generally Dumas v. Town of Mount Vernon*, 612 F.2d 974, 979 (5th Cir. 1980).

**6.** Defendants argue that CETA workers may not be considered "employees" under Title VII because the Borough does not exercise the same degree of control over such workers as it does over persons paid directly from Borough funds. In *Dumas v. Town of Mount Vernon*, 436 F.Supp. 866 (S.D.Ala.1977), the court declined to include CETA workers as municipal "employees" for the purpose of attaining the jurisdictional threshold. However, on appeal the Fifth Circuit found it unnecessary to reach the issue of whether CETA workers may be

counted as "employees" under Title VII inasmuch as the record demonstrated that even including CETA workers the Town did not meet the statutory definition of an employer. 612 F.2d 974, 980 (5th Cir. 1980).

**7.** It should be noted that the parties have not provided the type of evidence by which this court could conclusively determine the number of weeks during 1977 and 1978 in which more than 15 part- and full-time employees worked. I have accepted their stipulation as indicating that in 1977 and 1978 there were at least 20 weeks in which more than 15 part- and full-time employees were on the payroll.

**8.** The other two theories identified in *Shlei and Grossman* are "policies or practices which perpetuate in the present the effects of past discrimination, ... and (2) failure to make reason-

*Teamsters v. United States,* 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 1854, n.15, 52 L.Ed.2d 396 (1977). She contends that she was subject to disparate treatment as a special police officer solely because of her sex, and that she was the victim of facially neutral height and weight standards in June 1977 and a facially neutral policeman examination administered in November 1979, both having a "disparate impact" on her sex.

█ The analytical framework for plaintiff's sex discrimination claims is contained in the "order and allocation of proof" standards announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, the court must determine whether the plaintiff has offered "evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act." *Teamsters v. United States,* 431 U.S. at 358, 97 S.Ct. at 1866. If such a *prima facie* case of sex discrimination has been presented, the court must then ascertain whether the defendant has articulated "some legitimate, non-discretionary reason" for the actions that have adversely affected the complainant. *McDonnell Douglas Corp. v. Green,* 411 U.S. at 801, 93 S.Ct. at 1823. Finally, if defendant has successfully met the *prima facie* case, the court must examine the record to determine whether the plaintiff has shown that the defendant's legitimate non-discriminatory reason is in fact pretext. *Id.*

### 1. Disparate Treatment as a Special Police Officer

*McDonnell Douglas* also contains general requirements for establishing a *prima facie* case of discrimination under the disparate treatment theory:

This may be done by showing (i) that [the plaintiff] belongs to a [group protected by the statute]; (ii) that he applied and

able accommodation to an employee's religious observance or practices." *Id.* at 1.

**9.** For a statistical depiction of the type of criminal activity in the Borough of Duryea see plaintiff's Ex. Nos. 23 and 24.

was qualified for a job for which the employer was seeking applicants; (iii) that despite his qualifications he was rejected, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*Id.* at 802, 93 S.Ct. at 1824. *Accord, Mazus v. Department of Transportation,* 629 F.2d 870, at 873 (3d Cir., 1980); *Kunda v. Muhlenburg College,* 621 F.2d 532, 541 (3d Cir. 1980).

The record demonstrates that between August 1975 and June 1977 plaintiff was qualified to serve as a special police officer in the Borough of Duryea. She had more than one year on-the-job experience, and, in general, performed satisfactorily. In addition, she had successfully completed several law enforcement courses. Thus, although defendants attempt to portray plaintiff as totally incompetent, I believe that, given the nature of a police officer's job in a small community,[9] she possessed adequate qualifications.

The record further demonstrates that from August 1975 to September 1976 plaintiff did not receive any assignments as a special police officer. There is a paucity of evidence, however, concerning the availability of work for special police officers. Plaintiff has not adduced testimony or presented documentary evidence indicating the frequency and number of assignments given to other special police officers after August 5, 1975. Nor has there been any showing as to the number of "specials" who received work from the Borough following August 5, 1975.[10]

█ Although plaintiff has established that on February 15, 1976, a male, George Selden, was rehired as a special police officer and received assignments, she has not shown how often Selden worked. Furthermore, any suggestion of discriminatory in-

**10.** For example, former Mayor Olszewski stated in his deposition that the Borough retained 15 to 25 special police officers. (N.T. 16)

tent raised by Selden's employment is dispelled by the fact that he had seniority over plaintiff. I believe that employment based on seniority is an adequate articulation of "some legitimate, non-discriminatory reason" for the failure to give plaintiff special police officer assignments.[11] *See Board of Regents of Keene State College v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978) *(per curiam); Kunda v. Muhlenburg College,* 621 F.3d at 542–43. Plaintiff has not shown that employment by seniority in this case was a pretext for sex discrimination, and, therefore, she is not entitled to any relief for the failure to provide her job assignments as a special police officer.[12]

### 2. *Disparate Impact on the June 1977 Civil Service Exam*

■ The analytical framework utilized to assess the sufficiency of plaintiff's disparate treatment claim—proof of *prima facie* case, rebuttal, and surrebuttal—also applies to plaintiff's disparate impact claims. *See Teamsters v. United States,* 431 U.S. at 358, 97 S.Ct. at 1866; *Harless v. Duck,* 619 F.2d 611, 616 n.6 (6th Cir. 1980). Unlike the disparate treatment theory, however, the disparate impact theory focuses on the con-

sequences of facially neutral standards; intent to discriminate is *not* the ultimate issue in a disparate treatment case. *See generally Shlei and Grossman* at 1158.[13] Because the central concern of a disparate impact case is the consequences of, not the motive for, employment practices, the nature of the proof differs substantially from that presented in disparate treatment cases:

[T]o establish a *prima facie* case of discrimination, a plaintiff need only show that the facially neutral standards in question select applicants for hire in a significantly discriminatory pattern. Once it is shown that the employment standards are discriminatory in effect, the employer must meet 'the burden of showing that any given requirement has a manifest relationship to the employment in question.' If the employer proves that the challenged requirements are job related, the plaintiff may then show that other selection devices without a similar discriminatory effect would also 'serve the employer's legitimate interest in efficient and trustworthy workmanship.'[14]

*Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977).

11. Plaintiff has also suggested that she was discriminatorily denied assignments to cover private affairs, such as church picnics, school dances, etc. Plaintiff's proof on this point suffers from the same lack of specificity. There is nothing in the record on which to base a determination that but for her sex plaintiff would have received $x$ number of assignments for which she would have been paid $x$ amount of money. Even if such evidence had been adduced, however, plaintiff would not be entitled to any relief inasmuch as she failed to overcome defendants' showing that the Borough and its Police Department do not control such assignments. The private organizations themselves employed off-duty police officers to cover their social affairs.

12. It should also be noted that plaintiff quit her position as a special police officer in September or October of 1976 after working only two or three days as a school-crossing guard. She had accepted such work with the understanding that she would receive "regular" police assignments. I believe she acted unreasonably by leaving her job because after only three days she had not been given any police work. Nor do I believe that the conditions of the employment were so intolerable as to characterize her

voluntary termination as a "constructive discharge." *Young v. Southwestern Savings and Loan Association,* 509 F.2d 140 (5th Cir. 1975); *Muller v. United States Steel Corp.,* 509 F.2d 923 (10th Cir.), *cert. denied,* 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975). Accordingly, any actionable disparate treatment ended when plaintiff left her position.

13. The leading disparate impact case, *Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971), established the principle that Title VII "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation.... [G]ood intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability."

14. These standards apply to both governmental and private employers alike. *See Dothard v. Rawlinson,* 433 U.S. at 331 n.14, 97 S.Ct. at 2728; *United States v. Virginia,* 620 F.2d 1018, 1023 (4th Cir. 1980).

Height and weight minima, such as the 5'8", 140 lbs. requirement included in the regulations governing the June 1977 Duryea Police Officer's exam, clearly have a disparate impact on female applicants.[15] *See Dothard v. Rawlinson,* 443 U.S. at 331, 97 S.Ct. at 2727; *United States v. Virginia,* 620 F.2d 1018, 1023 (4th Cir. 1980); *Blake v. City of Los Angeles,* 595 F.2d 1367 (9th Cir. 1979), *cert. denied,* 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980); *Officers for Justice v. Civil Service Commission,* 395 F.Supp. 378, 380 (N.D.Cal.1975). Defendants have not suggested anything to the contrary; nor do they seriously assert that the 5'8", 140 lbs. standard has a demonstrable relationship to the successful job performance of a police officer. Rather, defendants contend that the height/weight requirements are simply irrelevant because plaintiff did not apply to take the June, 1977 test.

In *Teamsters v. United States,* 431 U.S. at 365–66, 97 S.Ct. at 1869, the Supreme Court declared that "[w]hen a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application." *See also Dothard v. Rawlinson,* 433 U.S. at 331, 97 S.Ct. at 2727. According to *Teamsters,* "resolution of the non-applicant's claim ... requires two distinct determinations: that he would have applied but for discrimination and that he would have been discriminatorily rejected had he applied." 431 U.S. at 368 n.52, 97 S.Ct. at 1871.

The key issue in making the first determination—that plaintiff would have applied but for the height and weight standards—is whether plaintiff was in fact aware of those requirements. The notice published in the local newspapers advertising the June 1977 examination did not mention height/weight minima, and plaintiff never

obtained a formal job application, which did contain the height/weight regulations. Plaintiff testified that J. William Domzalski, then a Borough councilman, Chairman of the Borough Civil Service Commission, and plaintiff's neighbor told her in response to requests for an application that she was unqualified because she "had to be 5'8", probably didn't weigh enough, ... [a]nd ... was probably too old." [16] (N.T. 430) She further testified that she "thought it would be fruitless" to apply in light of the Civil Service Commission Chairman's statements. (N.T. 432) Domzalski denied advising plaintiff of height/weight standards, testifying that the Borough's regulations were intended to establish height/weight ratios and not height/weight minima. (N.T. 170–172)

The conflict between Domzalski's and plaintiff's testimony creates a difficult credibility issue. On the one hand, the telephone log kept by an EEOC investigator assigned to plaintiff's case fails to mention that height/weight regulations were discussed in a conversation the day after plaintiff had talked with Domzalski, even though plaintiff insisted she had told the investigator about the height/weight problems. This factor tends to support Domzalski. One would think that a trained EEOC investigator would make special note of such tell tale signs of sex discrimination as height/weight requirements.

Two other notations in the EEOC investigator's log, however, lend credence to plaintiff's testimony. First, there is the entry for June 16, 1977, which notes plaintiff's age, height, and weight, thus suggesting that plaintiff had advised the investigator of age, height, and weight qualifications. And second, there is the entry of July 14th noting that the Borough's attorney, Mr. Musto, was asked to submit the Borough's height and weight requirements, thus confirming that the civil service regulations had been interjected into the EEOC com-

---

**15.** In this case, such prerequisites would have absolutely disqualified plaintiff, who stands approximately 5'0" and weighs approximately 125 lbs.

**16.** Plaintiff has apparently not pursued any claim regarding a requirement that she was too old to apply for the job.

plaint. Furthermore, the fact that the EEOC determination of July 29, 1977 deals with the height and weight requirements also buttresses plaintiff's story.

On balance, I believe that plaintiff's recollection is more persuasive and that Domzalski did in fact tell her that she was too short and did not weigh enough under civil service guidelines. In addition to the entries by EEOC investigators and the EEOC determination, I base my conclusion on plaintiff's tortuous efforts to secure an appointment on the Duryea police force. It is inconceivable that plaintiff would have voluntarily relinquished the chance to join the force after having so diligently sought a position for more than three years. In sum, I conclude that plaintiff would have applied for the civil service exam had she not been told that she was disqualified by height and weight requirements.

Having found that plaintiff would have applied for the job but for the discriminatory practices, it remains to be determined whether plaintiff would have been discriminatorily rejected had she applied. *Teamsters*, 431 U.S. at 369 n.53, 97 S.Ct. at 1871, suggests the analytical framework for making this determination:

**17.** According to *Shlei and Grossman*, "[v]alidation is the process by which one determines whether the test . . . is related to the job(s) for which it is used." *Id.* at 66.

**18.** In essence, plaintiff's entitlement to relief depends upon the proper construction of "qualifications" in the *Teamster* analysis. If by "qualifications" the Supreme Court denotes qualities or skills that render a person able to perform a certain job, then the failure to pass the 1979 civil service exam does not reflect on the plaintiff's qualifications. The court believes that the civil service examination lacks sufficient validation to make it predictive of job performance. *See generally* 29 C.F.R. §§ 1607.5 to .9 (1979). If the Supreme Court intended "qualifications" to denote any nondiscriminatory condition precedent to obtaining a given job, plaintiff could not prevail. If an employer may impose nondiscriminatory, nonpretextual conditions on obtaining employment so long as the employer does not discriminate, then perhaps the plaintiff must demonstrate the ability to meet such arbitrary qualifications in order to obtain backpay.

Inasmuch as the non-applicant's burden of proof will be to establish that his status is similar to that of the applicant, he must bear the burden of coming forward with the basic information about his qualifications that he would have presented in an application. . . [T]he burden will then be on the employer to show that the non-applicant was nevertheless not a victim of discrimination. For example, the employer might show that there were other, more qualified persons who would have been chosen for a particular vacancy, or that the non-applicant's stated qualifications were insufficient.

I have already found that the plaintiff's tenure under the Barnum Flood grant and her successful completion of several law enforcement courses established her qualifications to work in the Duryea Police Department. Defendants' attempts to portray plaintiff as totally incompetent were rejected as unpersuasive. Defendants insist, however, the plaintiff's lack of qualifications is substantiated by her failure of the Policeman Test administered in November of 1979.

Had defendants validated the 1979 examination, *i. e.*, demonstrated that the test is a valid predictor of job performance,[17] there might be some merit to their argument.[18]

While an employer may impose arbitrary conditions on hiring that do not discriminate for the purposes of determining whether a plaintiff states a cause of action under Title VII, *King v. Seaboard Coast Line R. Co.*, 538 F.2d 581, 583 (4th Cir. 1976), the court believes that the same reasoning does not necessarily apply once a plaintiff proves a violation of Title VII. *Cf. Rodriguez v. Taylor*, 569 F.2d 1231 (3d Cir. 1977). Once the violation of Title VII is proven, entitlement to back pay is presumptive. In *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975), the Supreme Court indicated:

It follows that given a finding of unlawful discrimination, back pay should only be denied for reasons which, if applied generally, would not frustrate the central statutory purpose of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination.

*Id.*

Because the court concludes that the plaintiff has failed to carry the burden of proving the discriminatory impact of the 1979 civil service

*Cf. Rodriguez v. Taylor*, 569 F.2d 1231 (3d Cir. 1977) (suggesting that post-discrimination exam results obtained prior to trial may be used to show lack of qualifications), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 514 (1978). But defendants did not establish a positive correlation between results on the policeman examination and subsequent job performance. Accordingly, the 1979 test results are not probative evidence of plaintiff's qualifications.

◼ In summary, I find that plaintiff was qualified for the position of police officer in the Borough of Duryea and that she failed to take the 1977 civil service examination because of discriminatory height and weight requirements.[19] There has been no showing that the males selected in her stead had superior qualifications.[20] Thus, plaintiff is entitled to relief in the form of back pay from June 30, 1977 until December 1, 1979.

### 3. *Disparate Impact on the 1977 Civil Service Exam*

Plaintiff contends that since a *prima facie* case of sex discrimination was established for the June, 1977 Civil Service test, the burden has shifted to the Borough to show that the November, 1979 exam was "job-related." In effect, plaintiff's position is that she need not establish that the facially neutral 1979 policeman exam selected successful applicants in a significantly discriminatory pattern. I cannot agree.

◼ Title VII requires that, *ceteris parabus*, male and female applicants are to be treated equally. If the employer adopts standards that do not have a disparate impact on a protected group, then the question of "job-relatedness" is simply irrelevant. Title VII is not a command the employers hire only the most qualified, and employers are free to use any criteria to select applicants, so long as the standards do not have a disparate impact on a protected group. In short, before job-relatedness becomes an issue, the plaintiff must establish a *prima facie* disparate impact case. *See Robinson v. City of Dallas*, 514 F.2d 1271, 1274 (5th Cir. 1975).

The only evidence suggesting disparate impact with respect to the 1979 policeman examination are statistics concerning the pass/fail rate of female applicants in the Wilkes-Barre-Scranton area. These statistics show that in the last seven years 74 men and three women have sat for the policeman test. Thirty males and all three female applicants failed the exam. Stated otherwise, 59.5 per cent of the male applicants passed, and 0 per cent of the females passed.

◼ It is well established that statistics alone may suffice to establish a prima facie case of discrimination. *See Hazelwood School District v. United States*, 433 U.S. 207, 308–09, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977); *Teamsters v. United States*, 431 U.S. at 339, 97 S.Ct. at 1856; *Mazus v. Department of Transportation*, at 874. The Supreme Court has also cautioned, however, that "statistics are not irrefutable; they

---

examination, an award of back pay beyond the date of the results of that examination would relieve the plaintiff of the consequences of that failure. Thus, withholding an award of back pay beyond that date would hardly thwart Title VII's purposes.

On the other hand, denying back pay for the interim period on the basis of an examination lacking adequate validation might thwart the statutory purpose. The court has found unlawful discrimination in the form of height and weight requirements. An award of back pay would make plaintiff whole for the injury suffered as a consequence of that discrimination. Such an award of back pay would also help to advance Title VII's goal of eradicating unlawful discrimination.

**19.** Defendants have argued that the height and weight provisions were not mandatory and could be waived. As noted in *Dothard v. Rawlinson*, 433 U.S. at 331 n.13, 97 S.Ct. at 2728 n.13, applicants must be informed of such waiver provisions. There is nothing in the record to suggest that plaintiff was informed of the possibility of a waiver.

**20.** It should be noted that the two males selected as a result of the June 1977 Civil Service exam did not take the November 1979 Civil Service exam, thus preventing a comparison of test scores.

come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances." *Teamsters v. United States*, 431 U.S. at 340, 97 S.Ct. at 1856. *Accord, New York Transit Authority v. Beazer*, 440 U.S. 568, 584 n.25, 99 S.Ct. 1355, 1365, n.25, 59 L.Ed.2d 587 (1979); *Mazus v. Department of Transportation*, at 875.

Judge Bechtle recently delineated the factors courts have considered significant in assessing the probative value of plaintiff's statistical showing:

> [A]s a starting point from which to examine the impact of a testing device or an employment criterion, courts have looked at the relative success rate for each racial group or, in the alternative, have examined the rate at which an employment criterion disqualifies racial groups. Secondly, the court must ascertain whether the number of candidates is so small that the statistical results do not reflect the "reality of the employment situation," or that the statistical universe is so small that the results achieved are due merely to chance or random distribution. Thirdly, statistical evidence tending to show a disparate impact, though based on a relatively small number of employment decisions may be augmented by evidence of significant acts of discrimination, which must be viewed in the context of the past employment practices of the defendant.

*Pennsylvania v. Rizzo*, 466 F.Supp. 1219, 1228 (E.D.Pa.1979).

■ I believe that the statistical universe here is so small that the results achieved may be due merely to chance or random distribution. Other courts have also rejected statistical evidence predicated on a relatively small sampling. For example, in *Pennsylvania v. Rizzo, supra*, Judge Bechtle found that the following statistical universe for three separate examinations was too small to be probative: Exam # 1, white candidates, 25, black candidates, 2; percentage white candidates passing 32 per cent, percentage black candidates passing, 0 per cent; Exam # 2, white candidates, 45, black candidates, 1; percentage white candidates passing, 33 per cent, percentage black candidates passing, 0 per cent; Exam # 3 white candidates, 99, black candidates, 6; percentage white candidates passing 40 per cent, percentage black candidates passing 0 per cent. In *Robinson v. City of Dallas*, 514 F.2d at 1273, the court found that plaintiff's showing that three of five employees disciplined under an employment rule were black was insufficient to establish a prima facie case of discrimination. *See also Officers for Justice v. Civil Service Commission*, 371 F.Supp. 1328 (N.D.Cal. 1973); *Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Service Commission*, 354 F.Supp. 778 (D.Conn.1973) (*Bridgeport Guardians I*). In sum, the small sampling involved here is insufficient to support any conclusion as to whether the policeman examination has a substantial disparate impact on female applicants.

■ The fact that plaintiff had been the victim of discriminatory employment practices prior to the November 1979 Civil Service exam has no bearing on plaintiff's failure to establish a prima facie case of disparate impact. Plaintiff has made no showing to suggest in any way that prior discriminatory practice would have either impeded her ability to successfully pass the exam or improved the male applicant's chances.[21] Thus, I find that plaintiff was no longer denied a position on the Duryea Police force solely because of her sex after the November 1979 Civil Service examination. At that point, plaintiff failed an examination which has not been shown in any

---

21. Plaintiff has suggested an inherent sexual bias in the exam because the questions are phrased in the male gender, the photographs are of male police officers, and the exam repeatedly refers to "policemen" rather than "police officers." I agree that these characteristics of the exam might evidence a sexual bias, but there has been no showing that this bias would affect an applicant's results. That is, there has been no showing that a female applicant would have scored better had 50 per cent of the questions been phrased or asked in the female gender and there had been photographs of policewomen.

meaningful manner to discriminate against female applicants. Accordingly, relief is limited from June 30, 1977 to the date she received the results of the 1979 examination.[22]

22. The parties will be directed to submit within twenty (20) days from the date of this Memorandum and Order proposed findings of fact and/or a stipulation as to the amount of back pay to be awarded plaintiff. Plaintiff will also be directed to submit an appropriate application for attorney's fees.